*In re* JOSÉ CASTRO FIGUEROA, Respondent.

No. D-65-2.        Decided June 27, 1968.

*J. B. Fernández Badillo, Solicitor General, Rodolfo Cruz Contreras, Acting Solicitor General, J. F. Rodríguez Rivera, Assistant Solicitor General,* and *Elpidio Arcaya, Assistant Solicitor General,* for The People. *José Castro Figueroa, pro se. E. L. Belén Trujillo* and *Ángel F. Vélez Pozo* for respondent.

PER CURIAM: The Solicitor General preferred six charges against attorney José Castro Figueroa for professional conduct. The same having been denied the Court appointed the then Superior Judge, Eduardo Ortiz Quiñones as Special Master, to hear and receive under oath in the presence of both parties the evidence they might introduce, and after hearing the evidence submitted, to certify and file it in the Office of the Secretary of the Court with his findings of fact. After hearing and receiving the oral and documentary evidence at a public hearing, in the presence of the parties, and after certifying the same, the Special Master submitted the following report with his findings of fact:

"From the testimonies given at the hearings held on May 2, 3, 5, and 9, 1966 and from the documentary evidence presented, the Special Master made the following findings of fact in each one of the charges:

I

*First Charge:*

"Respondent, José Castro Figueroa, after the relations of attorney and client were established between him and Roberto Sierra Mayol, observed an immoral and improper conduct as an attorney in unduly and unlawfully *appropriating* a check in the sum of three thousand three hundred and thirty dollars ($3,330) belonging to the said Sierra Mayol and disposing of said check after it was endorsed by the latter, and appropriating to his own use and benefit the equivalent of its value in money thus giving reason for Sierra Mayol to file a civil action against him to recover the above-mentioned amount of money.

"On May 14, 1965 the Superior Court, San Juan Part, rendered judgment ordering respondent herein 'to pay (to Sierra Mayol) the sum of $3,330 with interest at the rate of 6% per annum from January 21, 1964 to the date of its payment, plus costs and $350 for attorney's fees.'

*Findings of Fact:*

"1. Roberto Sierra Mayol retained the professional services of Mr. José Castro Figueroa for $100 to continue representing him before the Superior Court of Puerto Rico, San Juan Part, in a divorce suit, Civil No. RF-63-1239, in which he was defendant and counterclaimant, because his counsel Mr. Sánchez Bahamonde had withdrawn because of illness. This litigation concluded in a judgment denying the divorce.

"2. Subsequently Mr. Castro Figueroa assumed the representation of Sierra Mayol in a suit for Support Civil No. RF-63-2850, Piñero Widow of Mayol *et al.* v. Sierra *et al.*, before the San Juan Part of the Superior Court of Puerto Rico, in another action for divorce filed on November 13, 1963 by his wife under No. 63-3496 before the Caguas Part of the Superior Court of Puerto Rico; and in two incidents of contempt before the Superior Court, Caguas Part, on June 10, 1964 and September 11, 1964, for noncompliance with an order to provide for the support of his daughter.

"3. In January 1964, Sierra Mayol delivered to Mr. Castro Figueroa check No. 41,334 drawn by Caribbean Construction Corporation in the name of Roberto Sierra Mayol and Rosanna López Sierra for the amount of $3,330. This check had been certified by the Santurce Branch of the Banco de Ponce on June 25, 1963 under No. 3-2539 and was endorsed by Sierra Mayol. Mr. Castro Figueroa promised to obtain an authorization of the court so that Sierra Mayol could cash said check because his wife refused to endorse it.

"4. On January 17, 1964 Mr. Castro Figueroa and Mr. Carmelo Avila Medina, counsel of Mrs. Rosanna López Sierra in the divorce suit before the Superior Court, Caguas Part, signed a stipulation, which was approved by Mrs. López on January 20, 1964, accepting that the amount of the aforementioned check was a separate property which belonged to Sierra Mayol exclusively. Mrs. López endorsed the check, which continued in the possession of Mr. Castro Figueroa.

"5. Mr. Castro Figueroa added his endorsement to the aforementioned check, and on January 20, 1964 he went to cash it at the First Federal Savings & Loan Association of Puerto Rico of Santurce, Puerto Rico, receiving $3,330.

"6. At the repeated requests of Sierra Mayol concerning the check mentioned, Mr. Castro Figueroa answered that he had not been able to obtain the authorization of the court to cash it. In April 1964, Sierra Mayol found out that the check was not in the Caguas Part of the Superior Court and at his new requests Mr. Castro Figueroa countered with more promises and excuses but he did not receive any amount of money.

"7. Sierra Mayol has not paid Mr. Castro Figueroa for his professional services. On Monday, September 21, 1964, Sierra Mayol and his mother, Cecilia Mayol Sierra, succeeded in conferring with Mr. Castro Figueroa and required him to deliver the check immediately. He promised to go next day to the Caguas Court to obtain the authorization and to deliver the money on Thursday at one o'clock in the afternoon. That day they did not find him in his office.

"8. Some days later, Sierra Mayol visited Mr. Castro Figueroa's office again and his secretary, Miss Isabel Pizarro Cachola, gave him a bill dated September 28, 1964, charging $1,500 for each one of the divorce cases, $900 in the case for

support, and $100 for each one of the motions for contempt; for a total of $4,600, with a credit of $3,330, leaving a balance of $1,300 in favor of Mr. Castro Figueroa. The bill was accompanied by a note which read: 'Roberto:—If you agree with this bill sign the copy and leave it in my office. Thank you. (Signed) José Castro Figueroa.'

"9. Sierra Mayol retained the professional services of Mr. Joseph W. Kiefer so that he would collect from Mr. Castro Figueroa the amount of the check. Mr. Castro Figueroa informed Mr. Kiefer personally that he was going to deliver the money, but failed to do so.

"10. On October 26, 1964, Mr. Kiefer, as Sierra Mayol's counsel, filed a complaint for the recovery of money under No. 64-4340 before the Superior Court, San Juan Part. Judge Luis R. Polo, entered judgment by default on May 14, 1965. On July 9, 1965 Mr. Castro Figueroa filed a Motion for Reconsideration requesting the court to set aside the judgment by default, to reopen the case and, admitting that he had the money in his safe at the disposal of Sierra Mayol, and that 'if he does not want to pay defendant's attorney's fees, or the fees the defendant must collect from him, this is not sufficient cause to refuse to receive his money which the defendant had in custody.' The judgment was set aside on August 6, 1965.

"11. On August 18, 1965 Mr. Kiefer sent a registered letter to Mr. Castro Figueroa requesting the payment of the money or the depositing thereof in the court and did not receive any answer. On October 15, 1965 he filed an amended complaint requesting treble damages. In his amended answer of November 12, 1965, Mr. Castro Figueroa admitted having the money deposited in his office at the disposal of Sierra Mayol but alleging that the latter refused to accept it. On January 31, 1966 a hearing in default was held before Judge Manuel A. Moreda but the same was set aside because a motion for continuance filed on January 25, 1965 and which at that time did not appear attached to the record had not been considered. No further judicial steps were taken in this suit.

"12. From January 23, 1964 to the present time, Mr. Castro Figueroa has kept under his absolute control and possession the sum of $3,300, belonging to Sierra Mayol and has not delivered said amount despite the many judicial and extrajudicial requests made by Sierra Mayol and his attorney, Mr. Kiefer.

"13. Although in his answer to the charges of this complaint he reiterates once more that the money is in his possession and at the disposal of Sierra Mayol, Mr. Castro Figueroa has not performed any positive and effective, judicial or extrajudicial action to deliver said amount to its owner or to deposit it in the corresponding court."

## II

*Second Charge:*

"Respondent, José Castro Figueroa, while acting as attorney in the partition and liquidation of the inheritance of Isaías Vicente Parés, came in possession of the sum of one thousand four hundred seventeen dollars and thirty-nine cents ($1,417.39) belonging to the heiress Mrs. Gloria Norberta Catalina Parés Cosme, which sum of money was appropriated by respondent for his own and personal benefit, having refused to deliver the same to the legitimate owner, despite the steps taken by the latter and by her attorney, Mr. Olaguibet A. López Pacheco; in so acting respondent observed an immoral and improper conduct as an attorney.

*Findings of Fact:*

"1—Isaías Vicente Parés died intestate on October 27, 1959. Among the seventeen (17) heirs, judicially declared by Order of the San Juan Part of the Superior Court of Puerto Rico, in case No. 60-1338, there was Mrs. Gloria Norberta Catalina Parés Cosme.

"2—At his death, Don Isaías left an estate consisting of (a) a lot of 190 sq./m. and a zinc-roofed frame house, at 13 Street, Barrio Obrero, which was sold for $5,100; (b) a lot of 190 sq./m. and a zinc-roofed frame house, with a *mirador* (small apartment) and a shedhouse at 10 Street, Barrio Obrero, Puerto Rico, which was sold for $4,300; and (c) $4,215.47 in cash deposited in the Banco Popular de Puerto Rico; amounting to $13,615.47. From that amount on May 11, 1962, thirteen (13) of the heirs accepted a deduction of a gift of $800 for Adolfina Ortiz Parés; taxes, $106.36; water and light, $93.66; funeral expenses, $1,014.50; others $106; and $2,300 for attorney's fees; amounting to $4,429.52; leaving a remainder of $9,185.66, which divided by nine (9) hereditary shares, resulted in $1,020.66

for each one of the eight (8) brothers and sisters of the deceased and $113.41 for each one of nine (9) nephews and nieces.

"3—Luis Parés López and his wife, Adolfina Ortiz Parés, were left in charge of procuring the partition and liquidation of the inheritance and to help them they retained the professional services of Mr. Castro Figueroa.

"4—Mr. Castro Figueroa undertook to sell the real property, prepared several documents and obtained, among others, the signature of Gloria Norberta Catalina Parés Cosme in some of them. Mrs. Parés Cosme does not appear signing a document without number or date, entitled 'Deed of Sale,' in which the sale of the lot in 13 Street is described in favor of Luis González Rivera for $5,100.

"5—Mr. Castro Figueroa delivered to Luis Parés López the sum of $1,020.66 and to Adolfina Parés the sum of $800 as liquidation of their shares in the inheritance of Don Isaías.

"6—The day after delivering the shares of spouses Parés-Ortiz, Mr. Castro Figueroa accompanied by Adolfina went to visit Mrs. Parés Cosme but the latter refused to receive the amount offered. On another occasion when they went to Adolfina's residence they could not confer with her.

"7—Later, and during the subsequent six years, Mrs. Parés Cosme has taken numerous steps, personally and through Mr. Olaguibet López Pacheco, to obtain from Mr. Castro Figueroa the sum which corresponded to her as inheritance from her brother, but to no avail.

"8—From 1959 to the present time, Mr. Castro Figueroa has retained under his absolute control and possession the share which from the hereditary estate of Don Isaías belongs to Mrs. Parés Cosme, and unlike his verbal statements and in the answer to the charges of the complaint in the sense that said amount is at the disposal of its owner, during the last six years he has not performed any act directed to its actual and effective delivery."

III

*Third Charge:*

"Respondent, José Castro Figueroa, in the practice of his profession as attorney and notary, authorized a deed of sale of real property, on July 29, 1963, in which property the minor

Luis A. Pérez Márquez had a share, respondent agreeing with the purchaser to perform some legal actions so that the said minor would receive his share, this is, that 'he would finish certain steps in connection with a power of attorney,' and retaining the amount of two thousand two hundred dollars ($2,200) for that purpose; the truth being that at the time aforementioned the judicial proceeding to authorize said minor to sell his share had not commenced, which proceeding was brought by way of petition filed on April 8, 1964 in the case Ex Parte Luis A. Pérez Márquez, RF-64-1054. Respondent has retained for himself during all this time and up to the present the above-mentioned amount of two thousand two hundred dollars ($2,200) merging it with his own property, making his client, Juan Rivera Lima, believe that said amount of money already belonged to the minor Luis A. Pérez Márquez. Such a conduct on the part of the respondent is immoral and improper of an attorney.

*Findings of Fact:*

"1—On September 18, 1963 Juan Rivera Lima withdrew $4,200 from his bank account, borrowed $3,000 from his cousin, Perfecto Rivera Lima, and with $500 he had in cash completed the sum of $7,700. Next day he took that amount to Mr. José Castro Figueroa's office to pay it as the consideration in the sale of a property.

"2—On September 19, 1963, Aurea Rodríguez, Antonia Rodríguez, Benedicta Márquez, in representation of Luz María Márquez Rodríguez, and Elviro Santiago Ferrer, in representation of Luis Pérez Montilla, father of the minor Luis A. Pérez Márquez, signed and executed before Mr. Castro Figueroa a deed of sale of their interests in a property in favor of Juan Rivera Lima in the amount of $7,700. This total sum of $7,700 was delivered to Mr. Castro Figueroa to be distributed in shares of $2,200 for each one of the first two parties to the deed, $1,100 for the other two vendors, and $1,100 for attorney's fees.

"3—Mr. Castro Figueroa explained to Juan Rivera Lima and Elviro Santiago Ferrer that he would retain the amount corresponding to the minor until he obtained a judicial authorization to 'consolidate the minor's deed with the adults' deed,' but he did not explain that the sale of the minor's share in real estate interest had not been consummated in favor of Rivera Lima.

"4—Both, Rivera Lima and Santiago Ferrer took numerous steps urging Mr. Castro Figueroa to complete the proceedings

and to deliver the amount corresponding to the minor Pérez Márquez, but the only thing they received were excuses for the delay in the matter.

"5—After many requests Mr. Castro Figueroa delivered to Rivera Lima a simple copy of deed No. 66, dated July 29, 1963, where no mention was made of the share in the property which corresponded to the minor Pérez Márquez and the only amount set forth as the price of the sale was $5,500 without mentioning the remaining $2,200.

"6—On April 8, 1964, Mr. Castro Figueroa brought before the Superior Court of Puerto Rico, San Juan Part, under No. RF-64-1054, an action for Judicial Authorization to sell the share of the minor Pérez Márquez in the property aforementioned. On May 21, 1965 Judge Lucas F. Serbiá Córdova entered an Order authorizing the sale at public auction of the joint ownership belonging to the minor Pérez Márquez.

"7—On November 24, 1965 the publication of the edicts and the holding of the auction for a price not less than $1,100 were ordered. On November 26, 1965 a Notice was published that the Public Auction would take effect on December 21, 1965. Rivera Lima read the edicts published in the newspapers and since he was unable to contact Mr. Castro Figueroa, he retained the professional services of Mr. Augusto Burgos Mundo to represent him in connection with the public auction.

"8—On December 15, 1965, Rivera Lima filed through his attorneys a Motion for Intervention and another requesting the stay of the proceedings. The court did not take action on those motions. On December 21, 1965 the auction was suspended because the certificate of the publication of the edicts was not presented, without any other judicial action having been carried out up to the present time.

"9—From September 19, 1963 Mr. Castro Figueroa has retained under his absolute control and possession the sum of $1,100 belonging to Juan Rivera Lima, making Rivera Lima and Santiago Ferrer believe that the sale of the interest of the minor Pérez Márquez in a property had been carried out and that there only remained one additional proceeding before the court that would necessarily result in the perfection of the conveyance in favor of Rivera Lima."

# IV

*Fourth Charge:*

"Respondent, José Castro Figueroa, observed immoral and improper conduct as an attorney, as revealed by the facts described below: on April 27, 1959 the respondent received the amount of $900 from José Nazario González, proceeds of a transaction by virtue of which Víctor Ramos Santana sold to Nazario González a house allegedly belonging to the former as his share in the inheritance of his deceased wife Mrs. Matilde Vega. On this occasion, respondent agreed with the parties to said transaction to file the corresponding judicial action for the purpose of settling the matter of the hereditary share of Ramos Santana and of quieting the title on the house object of the transaction referred to. Respondent, however, proceeded to merge the said money with his own property without his clients' consent, allowing that the case which he filed before the corresponding court be dismissed for lack of prosecution on June 13, 1962, without giving any notice to his clients up to the present, either of the property belonging to the former which he unlawfully possessed or of the abandonment of the case in question.

*Findings of Fact:*

"1—On April 27, 1959 José Nazario González and Víctor Ramos Santana retained the professional services of Mr. José Castro Figueroa to perfect a transaction of sale of a property in which the heirs of the deceased wife of Ramos Santana, Matilde Vega, had shares.

"2—As payment for the sale transaction Nazario González paid the sum of $900. Moreover Ramos Santana executed a lease contract with option to purchase in favor of Nazario González, who took possession of the property immediately. Mr. Castro Figueroa retained the $900 delivering a receipt therefor in the name of Ramos Santana and his brother-in-law Juan Vega and committed himself to take the necessary steps to finish the sale transaction.

"3—On November 16, 1959 Mr. Castro Figueroa filed an action for the partition and division of hereditary property, Ramos v. Vega and the Heirs of William Vega, in the Superior Court of Puerto Rico, San Juan Part, under No. 59-7571. Juan Vega Vázquez answered and counterclaimed, but it does not appear that any of the Heirs of William Vega were summoned.

On June 13, 1962 judgment was rendered dismissing the case for want of prosecution in accordance with Rule 11 of the Rules of Administration for the Court of First Instance.

"4—After innumerable steps seeking to make Mr. Castro Figueroa accomplish the matters entrusted to him, on May 25, 1964, Ramos Santana obtained from the Office of the Clerk of the Superior Court, San Juan Part, a certified copy of the judgment of the dismissal aforementioned. Confronted with said order and the request to return the money and related documents, Mr. Castro Figueroa refused to do so and proceeded to file a motion to reopen the case and set the hearing on May 28, 1964, which motion was denied without prejudice on June 2, 1964. Since then no other judicial action has been taken.

"5—On August 27, 1964 Víctor Ramos Santana wrote to the Executive Director of the Bar Association complaining of Mr. Castro Figueroa's conduct and indicating his desire to recover the money and the documents in his possession for he had 'irrevocably dispensed with his services.' Copy of this letter was sent on October 6, 1964 to Mr. Castro Figueroa, who did not take any action thereon.

"6—From April 27, 1959 to the present time, Mr. Castro Figueroa has retained under his absolute control and possession the sum of $900 entrusted to him by José Nazario González and Víctor Ramos Santana as part of a sale transaction which Mr. Castro Figueroa promised to perfect, but he has not taken any steps in connection therewith since 1962."

## V

*Fifth Charge:*

"Respondent, José Castro Figueroa, observed immoral and improper conduct as an attorney, when after an attorney and client relation had been established between him and Ramón Figueroa, he took from the latter as a loan the amount of $2,500, refusing later to pay his creditor a great part of said amount of money causing that an action of debt be filed against him in which he was convicted on October 26, 1962. Respondent, notwithstanding the judgment rendered against him and the subsequent steps to recover the money taken by Figueroa, persisted and still persists in his refusal to fulfill his obligation, despite the fact that contemporaneously with said judgment and on

subsequent dates he had sufficient economic means to fulfill said obligation.

*Findings of Fact:*

"1—In 1958 Mr. José Castro Figueroa took from his client, Ramón Figueroa Franco, the sum of $2,500 as a loan. In order to evidence this debt he issued two notes: one dated October 14, 1958 in the principal amount of $2,000 that would become due on March 31, 1959, and another dated November 17, 1958 in the principal amount of $500 that would become due on May 17, 1959.

"2—On June 29, 1960 Mr. José Castro Figueroa and his wife Juanita Ramírez sold a property for the price of $100,000 of which they received the sum of $50,000, the purchaser having retained the sum of $50,000 to pay a mortgage which encumbered said property.

"3—On November 23, 1960, Mr. Ernesto Juan Fonfrías wrote a letter to Mr. Castro Figueroa requesting the payment of the amounts owed, which had become due and was an account stated. On December 12, 1960 he sent another letter to him acknowledging receipt of a letter from Mr. Castro Figueroa of December 7, confirming also a conversation between them and the latter admitting that he had paid instalments for $700. Likewise Mr. Castro Figueroa was granted until February 28, 1961 to pay the balance of the debt. On February 18, March 20, April 17, June 26, July 20, and October 9, 1961, Mr. Fonfrías sent separate demands for payment to Mr. Castro Figueroa, who paid another $140 in July 1961 and on October 13, 1961 he promised to pay the debt in full or to make a substantial payment if he succeeded in selling one of his properties.

"4—On April 19, 1962 Mr. Castro Figueroa and his wife Juanita Ramírez sold a property for $30,000 of which they received $14,000, the purchaser retaining the amount of $16,000 to pay a mortgage which encumbered said property.

"5—On January 12, 1962 Mr. Ramón Figueroa, through Messrs. Fonfrías and Fausto Ramos Quirós, filed a complaint for the recovery of money before the Superior Court, San Juan Part, under No. 62-213, requesting the payment of $1,600. On June 25, 1962 Mr. Castro Figueroa answered in his own right and denied all the averments of the complaint. On October 25, 1962 the hearing was held without the appearance of Mr. Castro Figueroa and on October 26, 1962 Judge Roberto Veray

Torregrosa rendered judgment ordering Mr. Castro Figueroa to pay $1,600 plus interest at the legal rate, costs, and $200 for attorney's fees. On October 26, 1962 copy of the notice of judgment was filed in the record.

"6—Routine investigations ordered by Mr. Fonfrías did not reveal that there were properties recorded in the Registry of Property in the name of Mr. Castro Figueroa and the former did not continue the steps taken for the execution of the judgment. Said judgment has not been recovered up to the present time.

"7—On June 21, 1963, Mr. Fonfrías acknowledged receipt of a letter from Mr. Castro Figueroa of June 14, 1963, accepted that Mr. Castro Figueroa would deduct the sum of $760 from the total of the judgment and pay $1,246 only as total payment for principal, interest, and attorney's fees. Mr. Castro Figueroa did not pay.

"8—From its maturity in 1959, Mr. Castro Figueroa owes Ramón Figueroa Franco an amount of money, account stated and despite innumerable judicial and extrajudicial demands and notwithstanding the final and unappealable judgment ordering him to pay, he has not paid said sum despite the fact that during the time that the debt has become due and account stated he has possessed property sufficient to pay the same."

*Sixth Charge:*

"Respondent, José Castro Figueroa, observed immoral and improper conduct as an attorney while in his capacity as attorney he took steps concerning the liquidation of the inheritance of the late Juan Duprey. This reproachable conduct consists in the following:

"1—Respondent filed case No. 63-3131 before the Superior Court, San Juan Part, where Carmen Gregoria Valdés Duprey appears as petitioner in a proceeding for declaration of heirship. However in a sworn statement given by respondent himself he stated as follows: 'she (Carmen Gregoria Valdés Duprey) has not given any case to me and has been unable to prove that she is one of the heirs.'

"2—The professional steps previously stated being clear, respondent compelled Mrs. Carmen Gregoria Valdés Duprey to endorse a check in her name for $450, proceeds of a house belonging to the heirs which was acquired by the Puerto Rico Aqueduct and Sewer Authority, and once said check was indorsed, respond-

ent proceeded to sign it and cash it for his own and personal benefit.

"3—Respondent took in his possession, against his client's will, a savings bankbook of the Banco Popular, belonging to the heirs which shows a balance of $444.43.

*Findings of Fact:*

"1—On January 7, 1953, Juan Duprey Ullanga deposited in the savings account No. 50118 in the Banco Popular de Puerto Rico the sum of $1,150. On January 13, 1953 he withdrew $300; on January 26, February 20, and March 16, 1953 he withdrew entries of $30; and on April 13, 1953 he withdrew $400, leaving a balance of $360. Until May 3, 1963 interest in the sum of $84.43 was entered in the bankbook representing this account, raising its balance to $444.43.

"2—On March 9, 1953 Juan Duprey executed deed No. 18 before notary public Gonzalo Ardín for a mortgage of $1,375 in favor of Rodulfo Rodríguez Rivera encumbering a property located at 10 Street of Barrio Obrero in Santurce. This debt drew interest at the rate of nine percent annually and was due on March 9, 1954.

"3—On April 23, 1953, Juan Duprey Ullanga died intestate. As part of his inheritance he left a property at 13 Street in Barrio Obrero, another at 10 Street in Barrio Obrero, and the bank account aforementioned.

"4—Right after the death, Mrs. Genara Duprey, the deceased's daughter, delivered to Mr. Castro Figueroa the bankbook described in the first paragraph.

"5—In 1955, the Water Resources Authority condemned the property in 13 Street and following the instructions of Mr. Castro Figueroa a check in the amount of $450 was drawn in payment of said property in favor of Mrs. Carmen Valdés Duprey. Following the instructions of Mr. Castro Figueroa, Mrs. Valdés Duprey indorsed the check and delivered it to Mr. Castro Figueroa, who proceeded to indorse it, cash it and appropriate the amount thereof.

"6—From May 8, 1953 to April 8, 1962, Mr. Castro Figueroa paid the sum of $8.25 monthly to Rodulfo Rodríguez, corresponding to the interest draw by the mortgage loan mentioned in the second paragraph.

"7—On February 13, 1962, Rodulfo Rodríguez wrote Mr. Castro Figueroa in connection with the sale of the mortgaged

property, urging him to terminate this matter as soon as possible to avoid bringing the case to court.

"8—On June 15, 1962 deed No. 66 was executed before Mr. Castro Figueroa by virtue of which Rodulfo Rodríguez granted to Catalino Figueroa Cruz the mortgage credit which encumbered the property of the Heirs of Juan Duprey. Figueroa Cruz signed this deed knowing, as Mr. Castro Figueroa did, that his title as purchaser was a fraud, that he had not delivered any price and that he was not interested in said transaction, Mr. Castro Figueroa being the one actually interested.

"9—After continuous requests of Mrs. Valdés Duprey in connection with the $450, on May 3, 1963 Mr. Castro Figueroa delivered to her the bankbook No. 50118 and directed her to take it to the bank to enter the interest and to return it to him so that it would continue under his custody. Mrs. Valdés Duprey did so.

"10—On July 22, 1963 Mr. Castro Figueroa filed a proceeding for declaration of heirship before the Superior Court, San Juan Part, under No. CS-63-3131 and the title Ex Parte Carmen Gregoria Valdés Duprey. The documentary evidence fails to establish that the late Providencia Duprey, Mrs. Valdés Duprey's mother, was the daughter of Juan Duprey. On July 23, 1964 the court issued an order requesting to set forth the reasons why this case should not be dismissed. On July 28, 1964 a motion was filed requesting the court not to dismiss the case and to set it for hearing. Between August 14, 1964 and March 5, 1965 the hearing of this case was continued seven times because the petitioner and her counsel did not appear. On March 16, 1966 another order was issued to state the reasons why the case should not be dismissed. No other judicial order or decision appears since on March 24, 1966 the record was sent to the Supreme Court of Puerto Rico.

"11—In a sworn statement given in San Juan, Puerto Rico, on September 28, 1964 before Mr. Manuel Tirado Viera, Assistant Solicitor General, Mr. Castro Figueroa said that Mrs. Valdés Duprey had not entrusted him with any case for its prosecution; that his professional services had been retained by Genara Duprey, with whom he had not communicated personally during eight years but through Mrs. Valdés Duprey; and that the proceeding for the declaration of heirship had been continued several times because it had not been possible to obtain the evidence that Mrs. Valdés Duprey is heiress of Juan Duprey

Ullanga. In San Juan, Puerto Rico, February 13, 1967. (Signed) EDUARDO E. ORTIZ, Special Master."

The Court granted the parties a term to present objections to the foregoing report, which were timely presented by respondent.

We have given careful consideration to the Report of the Special Master and to the objections against said report in the light of all the evidence in the record, and we must conclude that the findings of fact of the Special Master are amply and substantially supported by the evidence submitted.

Said findings of fact having been supported, the same reveal a serious unprofessional conduct, as being against the canons of professional ethics which govern the conduct of attorneys, and highly injurious to the interests of those who trusted respondent and entrusted him, as attorney, with the procurement and defense of those interests.

Judgment will be rendered ordering the disbarment of respondent, José Castro Figueroa, thus depriving him from practice as an attorney at law and notary public in Puerto Rico.